### FEDERAL INTERMEDIATE CREDIT BANK OF BALTIMORE v. GLOBE & RUTGERS FIRE INS. CO. et al.

#### Nos. 5237–5239.

District Court, D. Maryland.
May 17, 1934.

Irving P. Whitehead and Stuart S. Janney, of Janney, Ober & Williams, both of Baltimore, Md., for plaintiff.

Webster S. Blades, of Baltimore, Md. (Blades & Rosenfeld, of Baltimore, Md., of counsel), for defendant Globe & Rutgers Fire Ins. Co.

Walter L. Clark and Roszel C. Thomsen, both of Baltimore, Md., for defendant Franklin Fire Ins. Co.

S. Ralph Warnken, of Baltimore, Md. (Cook &,Markell, of Baltimore, Md., of counsel), for defendant Pacific Fire Ins. Co.

CHESNUT, District Judge.

These three separate suits at law have, by stipulation of counsel, been tried together under written waiver of jury trial. There is a question common to them all, the decision of which controls the verdict. Each of the defendants concedes a liability in some amount to the plaintiff but the plaintiff is suing for a much larger sum from each than the amounts respectively admitted. The question of liability for the larger amount does not depend on any controverted question as to the amount of the loss, nor on any disputed provision in any of the policies of any of the three defendants. The question depends upon the legal effect of a policy of another insurance company, which is not a party to the case. The particular question is whether the policy of this latter company constituted at the time of the loss what is called *specific insurance* or *monthly reporting* insurance. The policy in controversy is that of Lloyds Underwriters of London. It is the contention of the plaintiff in these cases that the Lloyds policy was on a monthly reporting basis, while the contention of the defendants is that the Lloyds policy was specific. The point turns on the construction of the "warranty clause" in the policy, as amended by a subsequent endorsement.

All of the policies insure against the risk of wind storm damage and each of the defendant's policies covered, as the subject matter of insurance, tobacco in several warehouses situated at different locations in Porto Rico. The tobacco belonged to several different owners whose interests in the tobacco at the several locations is described in a schedule of the insurance annexed to each of the defendant's policies. On September 26, 1932, while these policies were in force, a severe wind storm caused substantial damage to the tobacco covered in several but not all of the locations described in the policies.

The plaintiff was named in each of the policies as the loss payee under the standard mortgagee clause, and it is admitted that the amounts due to the plaintiff from the persons whose interests were severally insured by the policies, is greater than the amounts of the loss and damage payable under the policies and therefore, as between the plaintiff and the several interests insured, the whole loss payable under the policies is payable to the plaintiff.

The Lloyds policy, however, the effect of which is in dispute, insured tobacco of only *one* owner's interest and located in only *one* particular warehouse covered by the defendants' policies. That is to say, the coverage of the defendants' policies and the Lloyds policy had only one item in common and that consisted of tobacco belonging to the insured known as Tobacaleros de Cayey, and situated in its warehouse No. 3. The loss of this owner at this location was finally adjusted and agreed upon in the amount of $101,310.-68, and the sound value of this tobacco at the time of the loss and damage was determined to be $218,041.30.

The Globe and Rutgers Fire Insurance Company admits liability to the plaintiff in the principal amount of $5,327.16; the Pacific Fire Insurance Company admits liability to the plaintiff in the principal amount of $2,130.86; and the Franklin Fire Insurance Company admits liability to the plaintiff on one of its policies, in the amount of $3,196.-30. The liability for these amounts so admitted arises out of loss and damage to tobacco covered by the respective policies at locations *other* than Cayey Warehouse No. 3; and each of the defendants denies any liability under their respective policies just above mentioned for any portion of the loss or damage occurring in Cayey Warehouse No. 3. The Franklin Fire Insurance Company, however, had a separate and additional policy which admittedly constituted specific insurance on the contents of Cayey Warehouse No. 3 on which its admitted liability is $17,373.99. The several defendants contend that the balance of the loss of $101,310.68 in this warehouse (to wit, $83,936.69) is payable by the Lloyds policy; and this contention is based on the proposition that the Lloyds policy constituted at the time of the loss specific insurance as contrasted with monthly reporting insurance.

The controversy as to whether the Lloyds policy did constitute specific insurance or monthly reporting insurance arises out of the circumstances shortly to be stated. But first,

for clarity of understanding, it is important to state the difference between specific and monthly reporting insurance as the terms are understood and used in the insurance business, and applicable to this case. The expression "specific insurance" as here used, means insurance in a *specified* amount in the policy as contrasted with monthly reporting insurance which connotes, as to the amount of insurance, a fluctuating amount dependent upon the value from time to time of the tobacco insured at the particular location. The term "specific" as applied in insurance phraseology is frequently used in contrast with blanket insurance, the former denoting coverage of a particular piece of property or property at a specific location, as contrasted with the latter which covers the same and other property in several different locations. This, however, is not the sense in which the term "specific" is here used; although it so happens that the Lloyds policy, at least as originally written, was specific both as to amount insured and the location of the property.

Monthly reporting insurance is a device whereby the amount of insurance effective under the policy varies from time to time and does not exceed at any time the value of the property insured. As the amount of premium to be paid for the insurance is in direct proportion to the amount of the insurance granted by the policy, it is obvious that this form of insurance is more favorable to the insured than a policy for a specified amount of insurance where the premium is calculated and has to be paid on the amount specified in the policy although the value at risk may be materially less from time to time than the amount specified in the policy. In the event of a loss the insured can, of course, under the applicable principles of insurance law never recover a loss greater than the amount of insurance named in the policy even though the loss exceeds that amount. And if the amount of insurance greatly exceeds the values at risk the insured cannot recover in the event of a loss more than the amount of the loss and damage. It is obvious, therefore, that under a policy which is for a specific amount of insurance, the insured may often have to pay a premium in excess of the value at risk while in a reporting policy the insured pays a premium exactly proportionate to the values at risk from time to time. Under the latter form of policy the practice is that the insured keeps a daily record of the value of the property covered by the policy even though it fluctuates in amount from day to day, and at the end of

each month a report is made to the insurance company from which the average monthly value at risk is calculated and the premium at the rate agreed upon is payable on the amount so determined. In practice a provisional premium is paid in advance and at the end of the accounting period the final premium is adjusted between the parties, dependent upon the exact values which have been at risk during the period accounted for. In this particular case, prior to a time shortly before the loss and damage, the tobacco in Cayey Warehouse No. 3 was covered in part by specific insurance and in part by monthly reporting policies. The reason for this combination of the two forms of insurance was doubtless due to the inability of the insured to obtain full desired coverage under the monthly reporting form at the same rate. Therefore, to buy the insurance as cheaply as possible the insured obtained as much coverage as he could economically under the monthly reporting form but supplemented this by a certain amount of specific insurance. It is apparent that the specific insurance earns, or may earn in any given case, a larger premium in proportion to the amount at risk than the monthly reporting insurance because the flat premium calculated on the whole of the specified amount in the specific policy once paid will not be refunded in part unless the policy is cancelled and a return premium calculated at what is known as "short rates" is refunded; or unless the policy is reduced in amount with proportionate return at short rates. The specific policy therefore earns a premium on an amount which, by decrease in fluctuating values, may be greater than the amount actually at risk; while the reporting policy earns a premium only on the fluctuating amount in value from time to time. Therefore the most economical plan for the insured in such a situation is to carry specific insurance for an amount which is estimated to be the minimum value at risk during the particular period, and in addition thereto reporting insurance sufficient in amount to cover the maximum values expected to be at risk during the period. It is provided in the reporting policies that the amount of their respective coverage is limited to the difference between the amount of the specific insurance and the values actually at risk from time to time, and the premium is calculated on this balance of amount at risk and not on the total values. As a further protection the monthly reporting policies also in this case limited their coverage to a maximum amount over and above any specific insurance carried by the insured. In one sense the monthly reporting policies are thus excess insurance as contrasted with specific insurance. But it is to be noted, as is admitted in this case, that the monthly reporting policies are not excess *loss insurance* but are excess *contributing insurance*. That is to say, in the event of a loss all the insurance, both specific and monthly reporting, contribute to the loss in proportion to the amounts insured by the respective policies; the amount of contributing insurance covered by the specific policies being the amounts specified therein; and the amount of the reporting policies as contributing insurance being the excess of value at risk after deducting the specified amount in the specific policies. This result is accomplished by the provision or condition of the reporting insurance in this case known as the "pro rata clause" in combination with special provision to that effect in the "policy form" attached to the reporting insurance.

With this understanding of the nature of the two forms of insurance, the circumstances of the particular case will now be stated.

Prior to September 16, 1932, the tobacco in Cayey Warehouse No. 3 was covered by the following specific policies: Lloyds Underwriters, No. 80103, in the amount of $186,000; Franklin Fire Insurance Company No. T 1, in the amount of $38,500; Hamilton Fire Insurance Company No. T 1994, in the amount of $80,500; and also by the following reporting insurance: Franklin Fire Insurance Company, No. T 227, and Pacific Fire Insurance Company No. 51936, and Globe and Rutgers Fire Insurance Company No. 10392. These reporting policies covered this particular tobacco so located under a schedule to the maximum amount of $175,000, over and above any specific insurance; and in the respective proportions of 50% for the Globe and Rutgers; 30% for the Franklin and 20% for the Pacific.

The specific Hamilton policy T 1, in the amount of $80,500, was written to expire on September 16, 1932. Owing to a decrease in the values of the tobacco the insured did not desire to renew this policy or to replace it but its existence had an important relation to the Lloyds policy because the latter contained a so-called "warranty" to the effect that its validity and force depended upon the continued existence in force of the Hamilton policy on this risk. The nature and effect of this warranty and the change therein that was shortly later made is the important factor in the controversy. The significance of the warranty requires some explanation.

It is common knowledge in the insurance business that Lloyds Underwriters at London, although insuring risks all over the world, do not maintain local agencies for the writing of their policies, while many, if not most, of the insurance companies do maintain such agencies for necessary advice as to inspection and selection of risks. In lieu of the latter it is the custom of Lloyds to write policies on the condition or warranty that some other insurance company, in whose judgment and policy Lloyds have confidence, has accepted and is carrying a policy on the same property on the same general terms and conditions, subject to which Lloyds accepts the risk. The amount of insurance so to be carried by some other particular company is stated in the warranty on which Lloyds policy is conditioned. This practice was followed in the particular case in the issuance of the Lloyds policy, the effect of which is here in dispute. This Lloyds policy issued under date of February 16, 1932, covering the period January 7, 1932, to January 7, 1933, in the amount of $186,000 United States currency, contained the customary form of Lloyds' "warranty clause" which reads as follows:

"Warranty Clause:

"(Approved by Lloyd's Underwriters Fire and Non-Marine Association)

"Warranted same terms and conditions as and to follow settlements of 'Hamilton' Company, and that said Company has, at the time of any loss, and at the same gross rate, at least United States $80,000 (subject only to reduction by amount of any loss not reinstated) on the identical subject matter and risk, and in identically the same proportion on each separate part thereof.

"This Policy is subject without notice to the same conditions, endorsements, assignments, and alterations of rates as are, or may be, assumed in the above mentioned company's insurance upon which this policy is based and shall be deemed to include such risks of Lightning and/or Explosion as are included in that insurance."

The general effect of this warranty clause in Lloyds' policy is well understood in the insurance business and is in accordance with what has already been indicated. Thus if the Hamilton policy for any reason was cancelled or expired or ceased to be in force or, for any other reason, ceased to cover to the amount of $80,000, Lloyds' policy thereby ipso facto became void.

The insured needed and wished to retain the Lloyds policy as specific insurance but did not wish to continue the Hamilton policy. The whole matter of keeping the tobacco (on which the Bank had made loans to the various parties) insured by the policies in this case was committed to Alexander & Alexander, Insurance Brokers of Baltimore and New York. They in turn had originally secured the Lloyds policy through correspondence with Sedgwick, Collins & Co. (hereinafter sometimes called "Sedgwick") London Broker doing business with Lloyds. It is not disputed by the plaintiff that for all practical purposes of this case Sedgwick, although brokers only, represented and acted fully and advisedly for Lloyds Underwriters, it being said that all communications passing from Alexander & Alexander to Sedgwick were by the latter communicated to the Lloyds Underwriters. And it may further be here said that the plaintiff in this case as mortgagee does not assert any rights against the defendant companies superior to what the insured would be in a position to assert because Alexander & Alexander acted directly for the plaintiff as mortgagee in effecting and placing the insurance and in all matters pertaining thereto and kept their principal fully advised from time to time.

Appreciating the importance of the prospective expiration of the Hamilton policy, Alexander & Alexander in August, 1932, obtained authority from the plaintiff Bank and from the insured, to let the Hamilton policy referred to expire without replacement and to substitute by agreement with Lloyds, if it could be secured, the Globe and Rutgers policy as the "warranty company" instead of the Hamilton. To accomplish this Alexander & Alexander on September 1, 1932, wrote to Sedgwick, Collins & Co., as follows:

"New York, September 1, 1932.

"Sedgwick, Collins & Co. Ltd., London.

"Gentlemen: Lloyds' Policies Nos. F–80102 and F 80103 covering $186,000 each fire and tornado insurance on Tobacco contained in Warehouse No. 3 located at Cayey, Porto Rico, are warranted on the Hamilton for $80,000. each.

"Due to reduction in values, our Assured has instructed us not to renew Hamilton policies, which will expire on September 16.

"However, we have for this assured other policies written under a monthly reporting form with a limit of $175,000, at Warehouse No. 3. The Globe and Rutgers Fire Insurance Company carries 50% of this monthly reporting cover and we shall thank you to furnish us with endorsements substituting the

Globe and Rutgers as warranty for 50% of the limit of $175,000.

"Will you let us have your cable advice as soon as possible as to whether this substitution of warranty companies is satisfactory, as the Hamilton contracts will expire shortly.

"Very truly yours,
"Alexander & Alexander, Inc."

To this letter Sedgwick, Collins & Co. cabled the reply as follows:

"Tabacaleros Cayey change of warranty agreed."

Pursuant thereto on September 14, Sedgwick, Collins & Co. forwarded by mail to Alexander & Alexander a letter saying:

"We are in receipt of your favor of the 1st inst., and note the required change in the warranty contained in Lloyds' Policies Nos. F 80102/3, and we have pleasure in confirming our telegram reading 'Tabacaleros Cayey change in warranty agreed'. We enclose herewith the relative endorsements, which we trust you will find to be in order."

The endorsement referred to which was thereafter attached to the Lloyds policy, reads as follows:

"Attaching to policy No. F 80103 of Lloyd's Underwriters, London, issued to Tabacaleros de Cayey, Inc., Cayey, Porto Rico for a/c to whom it may concern. Memo. It is hereby declared and agreed that as and from 16th Sept. 1932, the warranty of the Hamilton is cancelled and replaced by the following:

"Warranted same rate, terms and conditions as 'Globe & Rutgers' with 50% of limit of $175,000 (reporting basis) Full clause. * * * All other terms and conditions remain unaltered. Dated 10th Sept. 1932."

This endorsement is on printed form of Sedgwick, Collins & Co., Ltd., 7 Gracechurch St., London, E. C. 3, and is initialed by what appears to be signatures of various groups of underwriters of the Lloyds policy.

The loss occurred on September 26, 1932, without further intervening correspondence. In due course, on January 11, 1933, the insured prepared formal proofs of loss and submitted them to the several Insurance Companies, including Lloyds, in which the amount of loss was claimed in a sum greater than that finally adjusted and in which the whole insurance on the Cayey Warehouse No. 3 was stated to be as follows:

"Globe ............... $ 87,500 floater
Pacific .................... 35,000 "
Franklin (T 2273)..... 52,500 "
Franklin ............. 38,500 specific
Lloyd's ............... 186,000 " "

The amount of the claim for loss as thus made by the insured with the approval of the Bank as mortgagee, was not agreed to by the several Insurance Companies, and negotiations ensued resulting finally in a New York Adjuster (Mr. Windle) of long experience being sent on behalf of all the Insurance Companies to Porto Rico to adjust the loss. He accomplished the adjustment with the agreement of all parties, and amended proofs of loss were thereupon (March 4, 1933) executed and forwarded to Lloyds, in which the loss and damage in the particular location was put at $101,310.68, and the same classification of the Franklin and Lloyds policies as specific insurance were therein again made. These proofs of loss were not sent to the American Insurance Companies, but were held by Mr. Windle by agreement with the Bank, pending hearing from Lloyds, and were never in fact delivered to the American Companies. In the proofs the whole loss at Cayey Warehouse No. 3 was apportioned to the two specific policies in the amount of $17,373.99 and $83,936.69 respectively. But in these proofs claim was made on the floater or reporting policies for their respective amounts of liability for the loss on tobacco in other locations. The proofs also contain the following:

"All these three reporting floater policies are current and carry the following clause: 5: In the event of specific insurance at any location covered by this policy, this insurance shall be held to apply at such locations for the difference between the specific insurance and the amount at risk in such locations not exceeding the sums thereby insured. * * * As the specific policies covering in Warehouse No. 3 exceed the sound value in that warehouse, the floater policies do not contribute to pay the loss therein." (As above noted the amount of the specific policies was $224,500, while the sound value of the tobacco in Cayey Warehouse No. 3 at the time of the loss was $218,041.30).

It is not questioned, but on the contrary is admitted by the parties to the case, that in effecting the change of warranty on the Lloyds policy, it was the full intention of Alexander & Alexander and of the plaintiff Bank and of the insured that the Lloyds policy should be continued as specific insurance.

The correspondence offered in evidence shows this very clearly and it is not disputed. But when Mr. Windle adjusted the loss in Porto Rico about March 4, 1933, he called to the attention of Mr. Mackie, representing the plaintiff Bank, that he thought the modified warranty on the Lloyds policy was ambiguous and it might be held that it constituted reporting or floater insurance rather than specific insurance by virtue of the new endorsement. Nevertheless the claimants, including the Bank, executed the revised proofs of loss in the form above mentioned and sent them to Lloyds. Apparently Mr. Windle separately advised Lloyds with regard to the situation and thereafter Lloyds refused to make settlement on the basis of the proofs and advanced the contention, in accordance with the suggestion made by Mr. Windle, that by virtue of the endorsement its policy had been *converted* from a specific cover of $186,-000 on Warehouse No. 3 to a form concurrent with the Globe constituting reporting insurance. On the latter basis the amount of their liability as computed by Mr. Windle was $27,680.51, on the hypothesis that Lloyds' policy contributed to the loss in exactly the same proportion that the Globe & Rutgers policy did, that is, 50% of the scheduled maximum of $175,000—to wit, contributing insurance in the amount of $58,333.33. Mr. Windle also made an alternative calculation on the assumption that the Lloyds policy constituted reporting insurance but contributed for its full amount of $186,000, by which Lloyds' liability was figured at $42,785.94. While Lloyds did not acknowledge liability in accordance with any of these calculations as to the amount of its liability, it nevertheless did, without prejudice, agree to pay $40,-000 and actually did pay to the plaintiff Bank on August 14, 1933, the sum of $38,982.12, but has refused to make further payment. Thereafter on September 25, 1933, the plaintiff brought these suits and now contends that the liability of Lloyds under the policy in dispute was limited to $27,680.51, and that the balance of its loss on Warehouse No. 3 is collectible from the three defendants in the respective amounts of $16,608.31 from the Franklin on its reporting policy; $27,680.-52 from the Globe & Rutgers and $11,072.20 from the Pacific, in *addition* to the amounts respectively admitted by these several Companies to be due on account of loss in other locations; and also claims $17,888.63 ($18,-269.14 diminished by operation of "full average" conditions) from the Franklin on its specific policy.

The facts developed at the trial consist of (1) a stipulation as to certain facts; (2) a proffer of proof by the defendants as to certain other facts, the relevancy but not the truth of which is disputed by the plaintiff, and (3) some oral testimony of witnesses.

The facts set out in the defendants' proffer of proof consist very largely of correspondence passing between Alexander & Alexander and Sedgwick, Collins & Co., with regard to the original placing of the Lloyds policy and the obtaining of the change in the warranty thereon, and correspondence subsequent to the loss in negotiations for other policies of fire and tornado insurance covering tobacco in the same locations, some of which letters incidentally refer, I think importantly, to the understanding of Alexander & Alexander and of Lloyds, acting through Sedgwick & Collins, as to the status of the Lloyds policy with particular reference to whether it continued to be specific insurance or was transformed into reporting insurance by the change in the warranty. Many of the letters contained in the defendants' proffer of proof which have no specific reference to the Lloyds policy are doubtless irrelevant except possibly for the very limited purpose of showing the course of the business between Alexander and the British brokers. I think it unnecessary to rule specifically upon the admissibility of each of the letters. To the extent that any of them are herein referred to, I hold that they are admissible in evidence for the purpose indicated.

As already noted, it was the intention and understanding of the plaintiff and its brokers that despite the change in the warranty on the Lloyds policy the latter continued to be specific insurance. And I think the conclusion is irresistible, as a matter of fact from the correspondence between the parties subsequent to the change, that Lloyds also, at least up to March, 1933, had the same understanding. And the actions of the parties in a practical and convincing way show this was their understanding of the status of the Lloyds policy. Thus we find that, while the insured through Alexander & Alexander currently, both before and after the change in the warranty on the Lloyds policy made monthly reports of values to the Companies issuing reporting insurance, no such monthly report was in fact ever requested by Lloyds or voluntarily made through Alexander & Alexander re Lloyds under the particular policy although such monthly reports were in fact made to Lloyds with regard to *another*

policy issued by it in *reporting form* covering the same tobaccos, which latter policy was in force for the period of November 12, 1932, to January 7, 1933. While the value of tobacco in Warehouse No. 3 at the time of the loss was less than the amounts of the Lloyds policy and the specific policy of the Franklin, the values thereafter at that location increased. From October 1 to October 21, inclusive, the specific insurance (treating it as $224,500 in amount) was exceeded in values by a total of $436,295.45. The report by the insured for October noted the amount of specific insurance of $224,500 which included Lloyds' policy in the amount of $186,000. Likewise the monthly report for November carried the notation "specific insurance as of November 1, 1932—$186,000 (which it is agreed referred to Lloyds' policy) reduced to $100,000 as of November 10, 1932"; and the monthly report for December also included the notation of specific insurance in the amount of $100,000, meaning the Lloyds policy. As of January 7, 1933, the reporting insurance was entirely discontinued and ordinary annual insurance substituted therefor. Under date of February 14, 1933, Alexander & Alexander reported to the Insurance Companies for the period January 1st to January 7th, 1933, including the item of $100,000 for specific insurance, again referring to the Lloyds policy.

Alexander & Alexander obtained through Sedgwick, Collins & Co., another Lloyds' policy No. F 81931, which covered in reporting form these same tobaccos, including other locations as well as in Warehouse No. 3, which was in force from November 12, 1932, to January 7, 1933. Under this policy Alexander & Alexander sent monthly reports to Sedgwick & Collins for November and December, 1932, and for the period January 1 to January 7, 1933. In the premium liquidation on this policy, prepared by the duly authorized agent of Lloyds for the period November 11 to November 30, 1932, there is shown the total value in Cayey Warehouse No. 3 of $210,390.35, from which was deducted "less specific insurance $100,000" and the premium was calculated on the balance of $110,390.35. The calculation also contained the following: "Specific insurance as of November 1, 1932, $186,000, reduced to $100,000 as of November 10, 1932." The specific insurance so referred to in this calculation was the Lloyds now in dispute. The reduction in the amount of the policy as of November 10th, 1932, is covered by the correspondence. When the reduction was made a return premium of $52.00 was refunded by Lloyds and an en-

dorsement issued accordingly which was calculated according to the "short period scale applicable." In a cable from Alexander & Alexander to Sedgwick, Collins & Co. dated November 10, 1932, it is also expressly stated that this policy represented "specific contributing insurance in addition to $175,000 limit under schedule." This cable was sent by Alexander & Alexander in reply to a query from Sedgwick, Collins & Co. as to whether a request by Alexander & Alexander to place certain reporting insurance might not clash with policy F 80103, from which it is possibly inferable that at that time Sedgwick, Collins & Co. may have been uncertain about the particular policy. But it is to be noted there was no contradiction but apparently entire acquiescence in Alexander's reply.

In finding the facts therefore I think the conclusion is irresistible on this evidence submitted and on other correspondence to the same effect, that both insurer and the insured under the Lloyds policy understood that the Lloyds policy continued to be specific insurance after the change in the warranty. No other conclusion seems to me to be possible in view of the correspondence and the actions of the parties. At various times the explicit statements are made by both parties, or their representatives, that the Lloyds policy after, as well as before the change in warranty was specific insurance and the return premium, on the reduction in Lloyds' policy F. 80103, was calculated on the basis of it still being specific insurance, and the premium on Lloyds' policy 81931 in the reporting form for the Cayey Warehouse No. 3 was also calculated on the basis of Lloyds' policy No. 80103 being specific. And the premiums on the reporting policy of the defendant companies were also calculated and paid on the basis of Lloyds' policy 80103 being specific insurance. At no time prior to Mr. Windle's suggestion of the ambiguity in the change in warranty did either party by word or action take the position that Lloyds' policy 80103 was changed by the endorsement in question into monthly reporting insurance. And their affirmative actions are inconsistent with such an understanding.

The present contention of plaintiff's counsel, however, is that the *necessary legal effect* of the wording of the change in warranty is to *convert* what was theretofore a *specific* policy into a *reporting* policy. This brings us finally to the point of law on which the case turns. It requires a construction of the warranty clause as amended by the en-

dorsement. The plaintiff contends that the significance of the expression "full clause" on the endorsement is to incorporate the "warranty clause" into the endorsement or merely to amend the original warranty clause by substituting the reference to the Globe & Rutgers policy in place of the prior reference to the Hamilton, both as to name and amount. In my view this position is correct. The more specific contention of the plaintiff's counsel is that the expression "Warranted same rate, terms and conditions as 'Globe & Rutgers'" requires the *substitution* of all the terms and conditions of the Globe & Rutgers policy for the terms and conditions of the Lloyds policy as originally written; with the necessary effect, it is said, that thereafter the Lloyds policy covered the loss in the same way and to the same extent only as the Globe & Rutgers covered, to wit, 50% of a limit of $175,000 instead of in the amount of $186,-000, for which amount the Lloyds policy was originally written. And it is said that if this is not the effect, then the only alternative under the warranty clause as amended is that the Lloyds policy ceased to have any effect whatever because the warranty would be broken in that the Globe & Rutgers policy was not on the same terms and conditions as Lloyds. There is, however, a further alternative which must be considered and that is whether, assuming that the expression "same terms and conditions" has the meaning attributed to it by plaintiff's counsel, the circumstances are not such that Lloyds would be estopped to claim a forfeiture of its policy by virtue thereof. (The rate of premium was in fact the same in both policies.)

In considering the effect of the warranty with the change, it is important to bear in mind the true nature and purpose of the warranty clause. The underlying reason for it has already been mentioned. It is also important to have in mind the form and structure of the Lloyds policy as compared with the policy of the Hamilton Company mentioned in the original warranty clause. The Lloyds policy consists of one printed page with some typewritten matter thereon. It states the fundamentals of the contract, describing the subject matter insured as "on tobacco, etc. (as per wording attached hereto which is to be taken and read as a part of this policy)." The "wording attached hereto" consists of three pages of typewritten matter which more particularly described the nature and location of the tobacco insured and contains in all thirteen separate paragraphs lettered from "a" to "m," both inclusive, which separately state various conditions or provisions governing the particular risk and the interests covered. Thus we find a very expanded description of the tobacco, a definition of the risk assumed, protection of the plaintiff bank under the standard mortgagee clause and special provisions with regard to cancellation of the policy, permission for other insurance and various other clauses modifying or waiving certain of the printed conditions of the Hamilton policy which otherwise would apply. These three typewritten pages constitute what is known in insurance language as the "policy form." The Lloyds policy does not contain the numerous printed conditions which are to be found in the Hamilton policy as well as in the policies of the defendants in this case.

Counsel for the parties hereto are in disagreement as to what is included in the expression "terms and conditions" as contained in the endorsement. The plaintiff says the expression includes the provisions of the "policy form" while defendants' counsel contend that the expression comprehends only the printed conditions of the American policies and does not include the policy form. But here again I think the plaintiff's contention is correct. When the Lloyds policy was originally issued, Alexander & Alexander sent to Sedgwick copy of the policy form to be attached to the Lloyds policy. It was a copy, except as to the amount of insurance, of the policy form attached to the Hamilton policy in so far as the coverage of the property was in common. It is also to be noted that the policy form attached to the Lloyds policy made it specific insurance and not reporting insurance. And in this respect it is also to be noted that the main difference between the policy forms attached to the Globe & Rutgers policy and the policy form attached to Lloyds' policy consists in the inclusion in the former (but not in the latter) of two paragraphs, "J" headed "Premium Adjustment Clause" and "K." These clauses are quoted in full in Note I. The effect

Note I: "J. *Premium Adjustment Clause:* It is the intent and understanding that this insurance will fully protect the Assured at any and all times to the extent of the actual value that may exist subject, however, to limits of liability as shown in Clause 'B' of this form. It is, therefore, understood and agreed that the Assured shall keep a daily record of the value of the property covered hereunder at each location and that within forty-five (45) days after the last day of each month shall furnish to this Company, through Alexander & Alexander, Inc., 80 Maiden Lane, New

of "J" is to provide that the amount of insurance shall be "the extent of the actual value" (subject to limits of liability) and to require the insured to make monthly reports of average values from which the premium shall be adjusted; while "K" provides that the amount of insurance shall be held to apply only for the difference between any specific insurance and the amount at risk at the location covered, not exceeding the maximum sum insured. The plaintiff says these two paragraphs "J" and "K" of the Globe & Rutgers policy were necessarily incorporated into the Lloyds policy by the change in the warranty.

The question must be determined in the light of established principles of insurance law. In view of the nature of the subject matter we naturally turn to the British decisions for authoritative precedents. But while the general form of Lloyds' policy has been in use for a very long time and the several provisions thereof have been frequently construed and applied by courts, the same is unfortunately not true with regard to the warranty clause. (Note 2.) Counsel have been able to refer me to only a very few British decisions which deal at all with this clause and none of them consider the very special situation that we have here resulting from the change made in the warranty. There seems to be no American decision construing the clause. (Note 3.)

But while there is a dearth of decisions on the warranty clause I think its general effect is well understood in insurance law and is reasonably free from uncertainty.

Without undertaking to make a complete analysis of its whole content, its more obvious effects may be stated, I think, as follows: It comprises (1) a stipulation or promise *by the assured*, as a condition on which the policy is based, that the other insurance company's policy named in the warranty will be in force and effect at the time of a loss to the stated amount, and (2) on the same terms and conditions and (3) subsequent changes in the terms and conditions of the warranted policy will automatically be incorporated into the particular policy, so that (4) the liability of the particular policy will depend on the liability of the other policy for loss occurring; but (5) the amounts of the liability of the particular company and the warranty company will depend upon the amounts of insurance respectively granted; that is to say, the adjustment of the loss as made by the company named in the warranty will determine the fact of liability of the particular policy containing the warranty clause, and the principles of adjustment, such as the value of the property at risk at the time of the loss and the amount of loss and damage incurred, will be controlling as the basis for the determination of the amount of liability under the particular policy. With respect to the required similarity of "terms and conditions" (other than the amount of insurance) it is apparent that the purpose of the clause is to require concurrency. The necessary effect, I think, is that if the terms and conditions of the warranty policy are different in any material respect from those con-

York City, a report of said values, together with the amount of any specific insurance that may be in effect (but failure to render such reports on the agreed date shall not void this insurance) and further the values for each month shall be averaged and considered the monthly report of values at risk hereunder. For the purpose of adjusting the premium hereunder, the monthly reports shall be averaged at the expiration of this policy and if the premium based on such averaged value and figured at the rate named herein exceeds the provisional premium at which this policy is written, the Assured shall pay an additional premium for such excess, but if the premium based on the averaged value figured at the rate named herein falls below the provisional premium for which this policy is written, a return premium for such difference shall be paid to the Assured hereunder.

"K. In the event of specific insurance at any location covered by this policy, this insurance shall be held to apply at such lo-

cations for the difference between the specific insurance and the amount at risk at such locations, not exceeding the sums hereby insured."

Note 2: In Richards on Insurance (4th Ed.) p. 17, in a note it is said:

"Justice Buller challenged this instrument as 'absurd and incoherent.' Brough v. Whitmore, 4 T. R. 206. Lord Mansfield called it 'a very strange instrument.' Le Cheminant v. Pearson, 4 Taunt, 380. Justice Lawrence said it was 'drawn with much laxity.' Marsden v. Reid, 3 East, 579. Nevertheless almost every word of it has been judicially construed, and therein consists its value. Simond v. Boydell, Doug. 268."

Note 3: In International Salt Co. v. Tennant, 144 Ill. App. 30, the court considered what seems to have been an American adaptation of this warranty clause but the decision is not otherwise helpful in this case.

tained in the particular policy which contains the warranty clause, the latter is thereby ipso facto voided; but, to the extent that the particular policy is silent as to terms and conditions contained in the other policy, the latter are thereby incorporated in the particular policy so that there will be concurrency. This is the view which I understand has been taken of the warranty clause by the English Court of Appeal in Barnard v. Faber, L. R. vol. I, Q. B. [1893] p. 340. See also Walker v. Uzielli, vol. I, p. 452, The Times Reports of Commercial Cases, 1896; The Sulphite Pulp Co. v. Faber, Idem, 146; Bancroft v. Heath, The Times Law Reports, vol. XVII, p. 425, 1901 (Court of Appeal); Beauchamp v. Faber, Idem, vol. XIV, p. 544, 1898 (Q. B. Div.).

 With this understanding of the general effect of the Lloyds "warranty clause" we come now to the more particular problem of the effect of the change made by the parties by the endorsement effective September 16, 1932. This must be construed in the light of well established principles of insurance law. The primary purpose is to ascertain the intention of the parties as expressed in the language used by them in the contract; and in the event of an ambiguity of expression, it is the well settled federal law in this country that the language is to be taken in its sense most favorable to the insured, Mutual Life Ins. Co. v. Hurni Co., 263 U. S. 167, 174, 44 S. Ct. 90, 68 L. Ed. 235; [1] Stipcich v. Insurance Co., 277 U. S. 311, 322, 48 S. Ct. 512, 72 L. Ed. 895; St. Paul F. & M. Ins. Co. v. Bachmann, 49 F.(2d) 158 (C. C. A. 4); and, as was said by the Supreme Court in Chicago v. Sheldon, 9 Wall. 50, 54, 19 L. Ed. 594:

"In cases where the language used by the parties to the contract is indefinite or ambiguous, and, hence, of doubtful construction, the practical interpretation by the parties themselves is entitled to great, if not controlling, influence."

This principle of construction has been specifically applied in Maryland in insurance cases, Callahan v. Linthicum, 43 Md. 97, 102, 20 Am. Rep. 106; Citizens' Fire Insurance Co. v. Doll, 35 Md. 107, 6 Am. Rep. 360, where Judge Alvey, speaking for the court said:

"And although it is very true, as contended by the appellee, that where an agreement is plain and free from all ambiguity, it will not be construed by the acts and admissions of the parties in reference to it, yet, where

the intention is obscure or doubtful, and extrinsic evidence can be invoked, no evidence is more reliable or entitled to greater consideration, as manifesting what their intention was, than the acts and conduct of the parties themselves."

It does not clearly appear whether the endorsement changing the warranty clause was received by the insured prior to the loss. But it was apparently accepted when received and attached to the policy, the insured and the Bank as mortgagee having no thought that it was in effect contrary to their understanding of the matter. Clearly it must be read in the light of Alexander's letter of Sept. 1st to Sedgwick. And this in turn must have been understood by Sedgwick in the light of general knowledge of experienced insurance brokers as to the difference between specific and reporting insurance. There is certainly no suggestion or intimation in that letter of any change contemplated in the nature of the Lloyds policy. The simple request is that the Globe & Rutgers policy, although on a reporting basis, should be substituted as the warranty company. The letter also told Sedgwick in this connection that the insured was carrying "other policies" written under a monthly reporting form with a limit of $175,000 at Warehouse No. 3, of which the Globe & Rutgers carried 50%. The clear implication of the letter was that the insured wished to drop the Hamilton policy of $80,000 named in the warranty clause but nevertheless to continue the Lloyds policy at $186,000 and to substitute for the warranty of the Hamilton that of the Globe & Rutgers. Plaintiff's counsel would attribute to Sedgwick the possibility of the understanding, from this letter, that Alexander proposed in legal effect to convert the Lloyds specific policy covering in the amount of $186,000 into a reporting policy with a limit of liability of 50% of $175,000 and thus create a situation whereby the insured would be carrying, and paying for, reporting insurance under a schedule whereby the several reporting insurance companies were bound to a total percentage of *150%* but with a limit of liability for all of $175,000 of value. And the necessary effect of this would be equivalent to the cancellation of the Lloyds policy for $186,000 but to require the insured to continue to pay a premium to Lloyds as a contributor to the general schedule, without the benefit of any additional insurance by virtue of the Lloyds policy; because the implication from Alexander's letter in referring to the policies with a limit of $175,000 and

mentioning the Globe & Rutgers as having only 50% of the amount, was that there were other policies supplementing the Globe & Rutgers to 100% of $175,000. This suggested construction of the information given to Sedgwick by Alexander's letter seems to me wholly inadmissible.

When the endorsement is read in the light of the information given to Sedgwick by the letter, it becomes quite unreasonable to interpret the wording of the endorsement, which was expressly stated to be pursuant to the unqualified assent of Sedgwick to the request contained in Alexander's letter, as evidencing an intention on the part of Lloyds to continue the liability under their policy only on the basis that the terms and conditions of the Globe and Rutgers policy (including the policy form which made it a reporting policy) should be the same as the terms and conditions (including the policy form) of the Lloyds policy. If this were so the result would be that Lloyds policy ceased to have any force by reason of what would be a breach of the warranty. But it is perfectly evident from what then and thereafter transpired that Sedgwick and Lloyds had no intention whatever of accomplishing a termination of the Lloyds policy. It is unnecessary to here repeat the facts and circumstances which convincingly demonstrate that the acts and conduct of Lloyds were wholly inconsistent with any such idea. Therefore to give to the expression "terms and conditions" the effect contended for by the plaintiff's counsel would create a situation which would clearly bring about a very definite estoppel against Lloyds to claim a forfeiture of the policy. Plaintiff seeks to escape this logical and I think necessary conclusion by contending as an alternative to the forfeiture of the Lloyds policy, for what amounts to a reformation thereof by a substitution for the policy form actually contained thereon, of the policy form of the Globe & Rutgers. If this had been the intention of Sedgwick we would naturally have expected them to cable Alexander for the new policy form to be attached to the Lloyds policy in substitution for the original one which is still attached thereto. But no suggestion of this kind was ever made by Sedgwick. And in American insurance practice at least, the substitution of one policy form for another is accomplished in quite a different way. The customary endorsement in such a case would be as follows: "The terms and conditions of this form are to be regarded as substituted for those of the policy to which it is attached; the latter being hereby waived," together with the physical attachment of the new form. See New York & P. R. S. S. Co. v. Ætna Ins. Co., 204 F. 255, 257 (C. C. A. 2); Shamrock Towing Co. v. Auto. Ins. Co., 17 F.(2d) 658 (D. C. N. Y.).

The plaintiff's contention is also opposed to the general nature of the warranty clause, which imposes a definite obligation on the assured as a condition of the insurance and is not, primarily at least, a promise by the insurer. It is true that by the latter part of the warranty clause, *subsequent* changes in the policy of the warranty company automatically apply to the Lloyds policy. But this part of the clause applies to *future* endorsements and not to the *existing* situation at the time of the issuance of the Lloyds policy. That is to say, it looks forward to *changes* in the policy of the warranty company, and does not have the effect of presently and automatically translating the *expressed* provisions of the Lloyds policy into those of the other company. The reason is obvious. Lloyds does not accept any and every risk that is offered merely on a representation that some other company has insured a risk. On the contrary it requires the fundamentals of *the particular risk* to be communicated and, if satisfactory, Lloyds accepts the risk and describes its essential terms in its own policy with the requirement by the warranty clause that another named insurance company has accepted the *same risk* upon the *same* rate, terms and conditions as are embraced in the Lloyds policy. It seems to me wholly impossible to give the warranty clause a meaning which would commit Lloyds to a risk of a different kind and character than that described in its own policy. But this in effect is what the plaintiff's contention seems to amount to. No authority has been brought to my attention which gives such a meaning or effect to the warranty clause.

But it is said that some effect must be given to the requirement that the terms and conditions of the two policies must be the same and that the effect of a holding for the defendants in this case is to give no meaning whatever to the expression "terms and conditions." While I accept the plaintiff's view that the normal meaning of "terms and conditions" as used in the warranty clause is broad enough to cover the provisions of the policy form as well as the printed conditions in the American policies, nevertheless it may be noted that the expression of itself does

not import a single and definite meaning. It is a general rather than a specific term in insurance phraseology. In this respect it contrasts with the very definite meaning attached to the expression "policy form" or to other insurance expressions such as "pro rata clause" or the "co-insurance clause." The word "conditions," at least in American insurance parlance, is generally understood to mean more particularly the printed conditions on the inside of the policy which serve generally as a limitation of risk or of liability or impose various conditions requiring compliance by the insured. The word "terms" is of even less definite meaning. The three Judges of the Court of Appeal in the case of Barnard v. Faber, supra, appear to have had different conceptions of the import of the word. Lindley, L. J. said:

"I do not profess to understand what the word 'terms' means. I suppose it means terms as to risk; it cannot mean terms which are immaterial for the purpose of the contract. What, I apprehend, the underwriters mean is this: 'Satisfy us that these two offices have insured the same risk, the same interest, at the same rate, and we will effect this insurance.' "

Bowen, L. J. said:

"I do not mean to say that the words of this clause of warranty are happily chosen, but I think the true meaning of the clause is really transparent. The object of this clause is to have other companies or underwriters in the same boat as regards the particular interest and the risk to be covered; and the clause is one which is intended unquestionably for the protection of the underwriters. * * *

"With regard to the word 'terms,' it is not necessary for us to decide, or to explain exactly what it means. I do not myself doubt that there is a limitation which can be put upon it—a limitation to be derived from the character of the document, from the nature of the transaction, and from the nature of the stipulation itself which reduces within defined and reasonable limits that which otherwise might be vague, impracticable, and illimitable."

But I do not think it necessary for the court to grope or speculate as to what may have been the possible thought of the framer of the endorsement, when we find it definitely established in the case by the words and actions of both parties that it did not have the meaning now contended for by the plaintiff. It certainly had no such meaning to the ex-perienced brokers, Alexander and Sedgwick, that the plaintiff now suggests. In this case the actions of the parties speak louder than their words. Indeed it seems to me the words as used in the modified endorsement have little or no particular meaning. Whatever difficulty of construction there is by virtue of their presence results, as not infrequently happens in somewhat similar situations, from too rigid adherence to the use of a *general* form for a *very special* case. In any event Lloyds, in my opinion, would be clearly estopped, at the suit of the plaintiff, from attributing to the words the meaning now contended for by the plaintiff in this case. The plaintiff's present position is a complete turnabout from the attitude it took contemporaneously with the transaction itself and which was constantly maintained until the change in Lloyds' attitude and its refusal to pay on the basis claimed in the plaintiff's proofs. See Luckenbach S. S. Co. v. W. R. Grace & Co., 267 F. 676 (C. C. A. 4). Indeed it is rather a nice question as to whether the plaintiff itself is not estopped to make the present claim against these defendants. But I think it unnecessary to place the decision on this ground. Of course the plaintiff has a difficult situation. Lloyds is not a party to this suit and will not be bound by the judgment and it is conceivable that another court which may have jurisdiction over Lloyds may take a different view. But this does not relieve me of the necessity of determining the rights of the parties to this case, which must be determined on the basis of the documents and relevant facts submitted here. Nor is the situation in this respect unprecedented as indeed it often happens in a suit against a particular insurance company that the amount of its liability must be determined by a finding from the facts, or mixed questions of law and fact, what was the whole amount of insurance at the time of the loss on the particular property, in order to determine, under the pro rata clause of the policy sued on, the amount of liability of the particular defendant company. Fire Ins. Ass'n of England v. Merchants' & Miners' Transportation Co., 66 Md. 339, 351, 7 A. 905, 59 Am. Rep. 162. And in such a case it is clearly established that the particular defendant is not conclusively bound by the written expressions of the plaintiff with other insurers not parties to the particular suit. What was in fact the whole insurance must be determined not only from the other writing itself but from the whole testimony in the case and if relevant, parol evidence can

be considered. In effect the court must determine from the evidence legally admissible what other insurance existed on the property at the time of the loss. See Richards on Insurance (4th Ed.) p. 456; Barreda v. Silsbee, 21 How. 146, 16 L. Ed. 86; 22 C. J. 1291, s. 1725; L. R. A. 1916A, 592; Lovett v. National Fire Ins. Co., 99 Kan. 759, 162 P. 1162; Fant v. Sprigg, 50 Md. 551, 557. As a procedural matter it is perhaps unfortunate that in such cases there is no equity jurisdiction for determination of the whole controversy against all the insurers in one suit. Rochester German Ins. Co. v. Schmidt, 175 F. 720 (C. C. A. 4).

■■ I conclude, therefore, that at the time of the loss Lloyds' policy in the amount of $186,000 constituted specific insurance and, together with the specific Franklin policy, must bear the whole of the loss on the tobacco in Cayey Warehouse No. 3, as the amount of the specific policies exceeded the value in that warehouse at the time. I will therefore enter a verdict for the plaintiff against the defendants respectively for the amounts which they admit to be due. I will include in the verdict interest at 6% from the time of institution of the suits. The plaintiff has not asked for the allowance of interest as a matter of right but only in the discretion of the court, accounting from March 4, 1933 (for the larger part of the loss claimed). By lines 172 to 179 of the printed conditions of the defendants' policies, the loss becomes payable only after "ascertainment of the loss or damage is made either by agreement between the insured and this company expressed in writing or by the filing by this company of an award as herein provided." The amount of the loss was not agreed upon until March 4, 1933. At that time the proofs of loss in accordance with the figures agreed upon were prepared by Mr. Windle acting for all the Companies,

and executed by the assured and the Bank and Lloyds' copy was sent to it by Mr. Windle with an explanatory letter. But, apparently by agreement of the parties, formal submission of the proofs to the other Companies was deferred pending learning Lloyds' attitude. On the latter's refusal to pay on the basis of the proofs these suits were filed, September 25, 1933, without the proofs being actually delivered. Apparently the defendants made no formal tender of the amounts claimed from them in the proofs but it is quite inferable that the plaintiff would not have accepted the amounts in full satisfaction. The defendants make no point that the submission of the revised proofs was a condition precedent to maintaining the suits against them. It is apparent that there was a mutual understanding that the matter should be held in abeyance until Lloyds' attitude was learned. The institution of the suits, however, was a demand for whatever was legally payable. Under the circumstances it seems to me just to allow interest from the date of this first formal demand.

The verdicts will, therefore, be as follows: In favor of the plaintiff against the Franklin Fire Insurance Company in the amount of $21,358.79; in favor of the plaintiff against the Globe & Rutgers Fire Insurance Company in the amount of $5,531.37, and in favor of the plaintiff against the Pacific Fire Insurance Company in the amount of $2,212.54.

I have rejected each of the three prayers or requests for instructions offered by the plaintiff in each of the three cases. It is unnecessary to rule on the defendants' prayers. In the rejection of its requested instructions and to the admission in evidence of that portion of the proffer of proof by the defendant which is herein referred to, exceptions are noted for the plaintiff.